Merrick, P.J.
After a trial without a jury, judgment was entered for the defendant on his counterclaims for abuse of process and G.L.c. 93A unfair and deceptive practices. The plaintiff tiled this Dist./Mun. Cts. R. A. D. A., Rule 8C, appeal of the denial of its Mass. R. Civ. P., Rule 41(b)(2), motion for involuntary dismissal of the defendant’s counterclaims. As the plaintiff challenges the sufficiency of the evidence to support the court’s judgment, we view the evidence in the light most favorable to the defendant for the purposes of this appeal. Edwards v. Sullivan and Cogliano Co., 2002 Mass. App. Div. 43; Hale v. Building 19 1/6, 2002 Mass. App. Div. 38.
The defendant and plaintiff-in-counterclaim, David P. Skerry (“Skerry”), has practiced law in the City of Medford for 35 years. More than half of his practice has involved serving as a fiduciary or representing fiduciaries. In 1991, he was appointed as conservator for Mary J. Culkeen (“Culkeen”) and served in that capacity until her death on July 31, 1999. Culkeen, confined to a nursing home, had received monthly Social Security payments by direct deposit to an account in the name of “David P. Skerry, Conservator, Property of Mary Culkeen” at the Medford Co-operative Bank (the “Bank”), the plaintiff and defendant-in-counterclaim herein. Skerry promptly notified the Social Security Administration (“SSA”) in August, 1999 of Culkeen’s death, forwarded a copy of her death certificate and thereafter contacted SSA on numerous occasions to terminate Culkeen’s monthly benefits. Despite these efforts, Social Security payments continued to be deposited in the conservator account through February, 2000. The total amount of these overpayments after Culkeen’s death, to which she and her estate were not entitled, was $5,925.00.
On August 31,1999, Skerry was appointed administrator of Culkeen’s estate. The estate’s principal asset was a two-family house occupied by elderly tenants. The house was in disrepair and the heating system was not functioning. Skerry used conservator account funds to pay for repairs and insurance on the house. He also paid Culkeen’s funeral and final expenses as well as a very small percentage of the fees due to him in the amount of $1,098.00. An inventory filed by Skerry, as administrator, in the Probate and Family Court on December 29,1999 reflected a balance in the conservator account of $181.40. The estate’s only other assets were the house, valued at $175,000.00, and the decedent’s personal effects, worth only $150.00.[1]
At the end of February, 2000, the SSA made a demand upon Skerry for repayment of the $5,925.00 in benefits deposited after Culkeen’s death. Skerry replied by letter dated March 1,2000 that there was very little cash in the estate and that it *121 would be needed to maintain the estate’s principal asset. He further stated that the house would be sold and offered to pay the $5,925.00 out of the proceeds of the sale. Skerry testified that in his 35 years of experience, the SSA customarily agreed to such arrangements for the correction of the very common problem of continued automatic payments after the death of a social security recipient. During the month of March, 2000 Skerry transferred most of the remaining funds in the conservator account at the Bank to an estate account he had opened, as Cul-keen’s administrator, at the Century Bank.
On March 2, 2000, Skerry was contacted by Henry T. Sampson (“Sampson”) of the plaintiff Bank about the Bank’s receipt of a U.S. Treasury Department “Notice of Reclamation” of the overpayments. Skerry advised Sampson that he was handling the matter with the SSA and provided copies of his correspondence with the SSA, including his March 1,2000 letter outlining the proposed settlement. Skerry testified that Sampson did not contact him again. Sampson testified that he knew Skerry to be an honest man, that Skerry had been on the list of attorneys the Bank retained for real estate closings, and that he would not have been on that list if he had not had a reputation in the community for honesty. Sampson was also aware that Skerry had sued Sampson’s boss, Robert Surabian (“Surabian”), the president of the Bank, on behalf of Surabian’s niece over a family matter and had obtained a settlement in the niece’s favor against Surabian for a substantial amount of money.
Sampson also testified that although he was the vice-president of the Bank for residential lending and had no knowledge of, or experience with, notices of reclamation or social security, he was asked to handle the Culkeen matter. The “Notice of Reclamation” received by the Bank clearly stated that the Bank’s liability would be limited if it followed the instructions set forth in the Notice within 60 days. The Notice directed that if the account funds were less than the social security overpayment amount, the existing funds should be paid by the Bank. If the account balance was zero, the Bank should instead simply provide the names and addresses of all withdrawers. In either event, the Notice of Reclamation obligated the Bank to mail notice to the account holder of any action it had taken or planned to take in response to the Notice. Neither Sampson, nor anyone at the Bank, responded to the Notice of Reclamation. The Bank subsequently elected to pay the $5,925.00 in its entirety to the U.S. Treasury Department. Sampson testified that the Bank had no legal obligation to do so, and had never requested a return of the funds from the SSA after its voluntary payment. The Bank did not issue any notice to Skerry of either its intent to make such payment, or of the fact that it had done so.
Unaware of the Bank’s action, Skerry paid $2,500.00 to the SSA as the first repayment installment.[2] On July 10,2000, the Bank filed suit against both “David R Skerry, Administrator of the Estate of Mary J. Culkeen” and “David R Kerry, Individually.” Service of the complaint on July 27, 2000 was not only the first notice Skerry received that the Bank had paid the Treasury Department, but also the first demand upon him for reimbursement. The complaint set forth claims for unjust enrichment and money had and received, and further alleged that Skerry, both as administrator and individually, had converted the $5,925.00 to his own use. Sampson testified that he never believed Skerry had converted the funds to his personal use, and that the Bank’s usual approach in such situations was to sue the estate and not the individual. There was further testimony that the Bank had obtained a lien on the Culkeen house and that such lien was senior to any lien by the Department of Medical Insurance for medicaid payments for the nursing home care of Culkeen.
*122 Skerry retained two separate attorneys to represent him as administrator and individually, and filed separate answers and counterclaims. As administrator, he submitted a Mass. R. Civ. P., Rule 68, offer of judgment in the amount of $6,083.30,[3] which the Bank accepted. The parties executed a stipulation of dismissal of all claims and counterclaims in the case against Skerry as administrator. Despite full satisfaction of its claim, the Bank delayed for a year, until the eve of trial, before filing a voluntary dismissal of its action against Skerry individually. Skerry’s counterclaims were tried without a jury, and the judge assessed $10,000.00 in damages on the abuse of process counterclaim and doubled that sum for an award of $20,000.00 on the G.L.c. 93A counterclaim. The Bank argues on this appeal that the denial of its motion for involuntary dismissal was error because the evidence was insufficient as a matter of law to support a finding for Skerry on either counterclaim.
1. The Bank’s Rule 41(b)(2) motion for involuntary dismissal was properly denied if “anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn” in favor of Skerry. Sonogram v. Metropolitan Prop. & Cas. Ins. Co., 2002 Mass. App. Div. 68, 70-71, quoting Raunela v. Hertz Corp., 361 Mass. 341, 343 (1972). See also DeViro v. Cellular Mobile Communications, Inc., 1993 Mass. App. Div. 48, 48-49. As the record is not devoid of evidence probative of Skerry’s counterclaims, the Bank was not entitled to judgment in its favor as a matter of law. The Bank’s Rule 41(b)(2) motion was, therefore, properly denied.
2. Abuse of process is the use of legal process “to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed.” Jones v. Brockton Public Markets, Inc., 369 Mass. 387, 389 (1975). It is “a form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money.” Vittands v. Sudduth, 49 Mass. App. Ct. 401, 406 (2000), quoting from Cohen v. Hurley, 20 Mass. App. Ct. 439, 442 (1980). The essential elements of the tort are that “(1) process was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage.” Gutierrez v. Massachusetts Bay Transp. Auth., 437 Mass. 396, 407 (2002). There is no question here that the first and third elements were satisfied. Process was clearly used and Skerry suffered damage, including the legal fees he was compelled to incur to retain separate counsel to represent himself individually.
Skerry also points to the potential damage to his personal and professional reputation by the Bank’s (or more properly, its executives’) filing of what it knew to be groundless allegations — that he had converted to his personal use funds he held as a fiduciary. The “ulterior or illegitimate purpose” element has been found in cases where, e.g., supplementary process was used to collect a debt known to have been already paid, Lorusso v. Bloom, 321 Mass. 9 (1947) or where property has been attached to enforce a claim known to be groundless. Reardon v. Sadd, 262 Mass. 345 (1928). Proof of motive or intent ordinarily requires the drawing of an inference. Powers v. Leno, 24 Mass. App. Ct. 381, 383-384 (1987). While the evidence is hardly overwhelming on this point, it would have permitted the trial judge to infer that the Bank proceeded with questionable intentions to level a groundless charge of conversion against Skerry. The responsible officer at the Bank regarded Skerry as a man of unquestioned probity and did not believe he had in any way misappropriated funds. The Bank, through this officer, knew that Skerry had repeatedly advised the SSA of the overpayments and had proposed a settlement plan for their return, and that Skerry handled the funds in the regular course of his administration of Cul-keen’s estate. The Bank had sued Skerry as administrator of that estate, and had secured its recovery on any judgment that may have entered in its favor by a lien on *123 the estate’s principal asset. The value of that asset far exceeded the $5,925.00 sought by the Bank. Yet the Bank departed from its customary practice of proceeding only against the estate and brought an additional, individual action against the very attorney who had prevailed in a costly lawsuit against the Bank’s president.
While proof of ill will, bad intentions, or knowledge that a claim is groundless is not alone sufficient (or necessary) to establish liability for abuse of process, see Beecy v. Pucciarelli, 387 Mass. 589, 596 (1982); Bednarz v. Bednarz, 27 Mass. App. Ct. 668, 673-674 (1989), it is relevant in proving ulterior or illegitimate purpose. Ladd v. Polidoro, 424 Mass. 196, 199-200 (1997); Fishman v. Brooks, 396 Mass. 643, 652 (1986). See Cady v. Marcella, 49 Mass. App. Ct. 334, 342 (2000). Further, where there is evidence that process has been utilized as a “threat or a club” to coerce or extort some collateral advantage, Cohen v. Hurley, supra at 442, or to “put pressure upon the [defendant] to compel him... to take some... action,” Powers v. Leno, supra at 384, the requisite ulterior purpose may be found. The trial judge may well have inferred that the Bank’s negligence in failing to comply with the Notice of Reclamation, compounded by its embarrassing mistake in electing to make a complete payment to the U.S. Treasury, rendered it particularly anxious to recover the money. The Bank may have questioned its ability to recover fully from the Culkeen estate what a trial court might have viewed as a gratuitous Bank payment of social security benefits that the estate was already repaying directly to the SSA. Thus it could have been reasonably concluded that the Bank’s conversion claim against Skerry individually, with its threat to Skerry’s reputation and practice, was designed to pressure him into quickly concluding the action by reimbursing the Bank in his capacity as administrator. So viewed, the Bank’s groundless conversion claim was tor tiously used as an “instrument of persuasion rather than a means of satisfaction,” Koonce v. Aldo Realty Trust, 8 Mass. App. Ct. 199, 201 (1979), and constituted an abuse of process.
3. There was also no error in the denial of the Bank’s motion for involuntary dismissal of Skerry’s G.L.c. 93A counterclaim for unfair and deceptive practices. Conduct amounting to an abuse of process may also constitute a violation of G.L.c. 93A and serve as the basis for a recovery under that statute. See, e.g., Wyler v. Bonnell Motors, Inc., 35 Mass. App. Ct. 563 (1993).
The Bank argues that because Skerry’s G.L.c. 93A counterclaim referred specifically to a violation of the Fair Debt Collection Practices Act, 15 U.S.C. 1692 (a)-(o), Skerry cannot recover under G.L.c. 93A for unfair and deceptive practices based upon abuse of process. Such argument overstates Massachusetts “notice pleading” principles which do not require that a complaint or counterclaim state a correct substantive theory of recovery and which do not require dismissal when the claim would support relief on an alternative theory. Gallant v. Worcester, 383 Mass. 707, 709-710 (1981); Berish v. Bornstein, 437 Mass. 252, 269 (2002). It is established that the scope of “unfair and deceptive acts or practices” actionable under G.Lc. 93A is broader than common law or other statutory bases of recovery. See, e.g., U.S. Funding, Inc. of America v. Bank of Boston Corp., 28 Mass. App. Ct. 404, 407 (1990). Moreover, Skerry’s c. 93A counterclaim incorporated by reference the factual allegations of his first counterclaim[4] asserting, inter alia, that despite the Bank’s knowledge that Skerry had negotiated a settlement with the SSA and had no knowledge of the Bank’s voluntary payment, the Bank engaged in conduct “to harass ... and abuse” Skerry in an attempt to obtain reimbursement. Such allegations supported Skerry’s claim for relief on an abuse of process theory.
There is also no merit in the Bank’s final contention that because Attorney Skerry practices law, he could not recover on his counterclaim pursuant to G.L.c. *124 93A, §§2 and 9 because §9 excludes claims by persons engaged in “trade or commerce” who are entitled to recover under G.L.c. 93A, §11. We need not decide whether the allegations of conversion of funds to his own use brought in a suit against Skerry as an individual amounted solely to an injury to him as one in trade or commerce. Given that Skerry’s G.L.c. 93A claim was raised as a counterclaim and thus required no demand letter, and that there are no other differences between §§9 and 11 which are pertinent to this case, the distinction is immaterial.
4. We authorize an award of appellate attorney’s fees to Skerry to be assessed by a trial court judge upon motion, detailed affidavit and notice. Patry v. Liberty Mobilehome Sales, Inc., 394 Mass. 270, 272 (1985).
Judgment affirmed.
So ordered.

 No objection was ever filed to the inventory and accounts submitted by Skerry as conservator or administrator.

 The record does not indicate whether the overpayment to the SSA was recovered.

 This figure was apparently the sum of the $5,925.00 overpayment amount and costs.

 Skerry’s first counterclaim was captioned “Violation of Fair Debt Collection Practices Act.” His voluntary dismissal of that counterclaim prior to trial should have been a clear signal to the Bank that his G.L.c. 93A counterclaim was based on grounds other than the Bank’s alleged violation of the federal statute.